**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FORT WORTH EMPLOYEES' RETIREMENT FUND and CITY OF MIAMI GENERAL EMPLOYEES' & SANITATION EMPLOYEES' RETIREMENT TRUST, on behalf of themselves and all similarly situated investors, | Civil Action No. 09-CV-638 |
| | CORRECTED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| Plaintiffs, | |
| v. | ECF CASE |
| BANK OF AMERICA CORPORATION, KENNETH D. LEWIS, and JOHN A. THAIN, | JURY TRIAL DEMAND |
| Defendants. | |

Plaintiffs allege as follows based upon personal knowledge as to themselves and otherwise upon an investigation conducted by counsel, which included, among other things, a review of the following material: (a) filings made with the Securities and Exchange Commission ("SEC"); (b) press releases, news reports and analyst reports; (c) transcripts of conference calls with securities analysts; and (d) other publicly-available news reports.

## I. INTRODUCTION

1.      This action is brought on behalf of shareholders of Bank of America Corporation ("Bank of America" or the "Company") and arises from material misstatements and omissions in proxy communications and other public statements with respect to Bank of America's acquisition of Merrill Lynch & Co., Inc. ("Merrill Lynch"). This action asserts claims under Section 14(a) of

the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder by the SEC, which claims seek redress on the basis of negligence and do not sound in fraud.  This action also asserts separate claims under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC, as well as under Section 20(a) of the Exchange Act, which claims do sound in fraud.

2.    On September 15, 2008, Bank of America and Merrill Lynch announced that they had entered into an agreement for Bank of America to acquire Merrill Lynch in an all-stock transaction valued at approximately $50 billion (the "Acquisition").  Under the terms of the agreement, holders of Merrill Lynch common stock would have a right to receive 0.8595 of a share of Bank of America common stock for each share of Merrill Lynch common stock held immediately prior to the Acquisition.  A total of more than 1.7 billion shares of Bank of America common stock were expected to be issued to Merrill Lynch shareholders in connection with the Acquisition.

3.    The agreement required the approval of Bank of America shareholders.  To that end, Bank of America and Merrill Lynch, under the signatures of their respective Chairmen and Chief Executive Officers, defendants Kenneth D. Lewis and John A. Thain, issued a joint proxy statement dated October 31, 2008 (the "Proxy Statement") to the shareholders of Bank of America soliciting their approval for the Acquisition and recommending a vote in favor of the Acquisition.

4.    The Proxy Statement contained material misstatements and omissions.  The Proxy

Statement did not accurately disclose Merrill Lynch's financial condition and did not disclose the significant risks and liabilities that Bank of America and its shareholders would be assuming by acquiring Merrill Lynch. Nor did the Proxy Statement reveal that Bank of America and its advisors had not conducted adequate diligence on Merrill Lynch and that, as a result, they lacked a reasonable basis for the recommendations and other statements set forth in the Proxy Statement. As a result of defendants' extraordinary negligence, the Proxy Statement contained material misstatements and omissions concerning these matters. These negligent misrepresentations were in violation of Section 14(a) and Rule 14a-9.

5.      The Proxy Statement announced that a vote with respect to the Acquisition would be held by Bank of America shareholders at a special meeting approximately one month later, on December 5, 2008. In the interim, defendants were obligated, pursuant to Section 14(a) and Rule 14a-9, to correct and update the misstatements contained in the Proxy Statement and were required to inform shareholders of any material adverse developments at Merrill Lynch that could have a significant impact on Bank of America and its shareholders in the event the Acquisition were consummated. Defendants failed to fulfill this duty and did not update or correct the statements in the Proxy Statement prior to December 5, 2008, even as Merrill Lynch's material losses mounted beyond anything previously disclosed The failure to update or correct the Proxy Statement was a further violation of Section 14(a) and Rule 14a-9.

6.      As planned, the Bank of America shareholders' vote on the Acquisition was held on schedule on December 5, 2008. The Acquisition was overwhelmingly approved, with 82% of votes cast in favor of the transaction. This vote was obtained improperly on the basis of material

misstatements and omissions in the Proxy Statement and related disclosures in violation of Section 14(a) and Rule 14a-9, which directly caused substantial harm to the Class, as defined below.

7.      The Acquisition closed on January 1, 2009.  On the same date, Bank of America issued a press release announcing the Acquisition's completion.  The press release contained numerous positive statements concerning the Acquisition and the joined companies, touting the "creat[ion of] a premier financial services franchise with significantly  enhanced wealth management, investment banking and international capabilities."  The statements in this press release were made in violation of Section 10(b) and Rule 10b-5 because they failed to disclose material facts known to or recklessly disregarded by defendants.

8.      In particular, these statements did not reveal that Merrill Lynch's financial condition was in such a deteriorated state that Bank of America had actually considered withdrawing from the Acquisition prior to closing.  Nor did they reveal that, given Merrill Lynch's unstable financial condition, Bank of America was only willing to complete the transaction because the federal government had undertaken to assist Bank of America to absorb the acquisition of Merrill Lynch by, among other things, engaging in a highly dilutive purchase of additional Bank of America shares.  Indeed, Defendant Lewis regarded the severe state of Merrill Lynch's financial condition as such a significant risk that on December 17, 2008—more than two full weeks before the self-congratulatory January 1, 2009 press release—Lewis conducted personal meetings with the Chairman of the Federal Reserve Board and the Secretary of the Treasury, threatening to withdraw from the Acquisition unless the federal government agreed to

-4-

provide additional financial assistance to Bank of America. Merrill Lynch's mounting losses were even discussed at a Merrill Lynch board meeting on December 8, 2008—the last Merrill Lynch board meeting prior to the Acquisition closing date—in which, according to *The Wall Street Journal*, Defendant Thain described November as "one of the worst months on Wall Street in history." None of this highly material information was revealed to the investing public, as required by Section 10(b) and Rule 10b-5.

9.      The true facts concerning Merrill Lynch's financial condition and the severely negative impact it would have on Bank of America and its shareholders began to emerge approximately six weeks after defendants had procured the votes of Bank of America shareholders pursuant to the untrue Proxy Statement and only two weeks after the Acquisition had been completed. After the markets had closed on January 14, 2009, investors learned that Bank of America would most likely be receiving a significant injection of additional capital from the federal government and that the federal government would backstop billions of dollars of losses on toxic assets—all necessitated as a result of the Acquisition and the deteriorated state of Merrill Lynch. Thereafter, on January 16, 2009, investors learned that the federal financial assistance to Bank of America would consist of a $20 billion investment in preferred stock and a guarantee to backstop future losses on $118 billion in toxic assets, mainly from the Merrill Lynch portfolio. On January 16, 2009, Bank of America also issued its preliminary financial results for the fourth quarter and full year, 2008, disclosing an overall loss for the fourth quarter of $1.79 billion, led by a stunning $15.31 billion fourth quarter net loss at Merrill Lynch. Based on this new information, on January 20, 2009, analysts concluded that Bank of America would likely

need to raise an additional $80 billion to restore its capital to adequate levels. These revelations caused the price of Bank of America stock to tumble, from a closing price of $10.20 per share on January 14, 2009 to close at $5.10 per share on January 20, 2009, a stunning 50% decline.

10.     This action seeks to recover damages, under Section 14(a) and Rule 14a-9, on behalf of Bank of America shareholders who were eligible to vote on the Acquisition at the December 5, 2008 Bank of America shareholder meeting, pursuant to the material misstatements and omissions negligently set forth in the Proxy Statement and related disclosures. This action also seeks to recover damages for securities fraud under Section 10(b) and Rule 10b-5 on behalf of investors who purchased or otherwise acquired the securities of Bank of America during the period from January 2, 2009 until January 20, 2009, during which period defendants either knew or recklessly disregarded material facts that were not disclosed to the investing public.

## II. JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 28 U.S.C. § 78aa.

12.     Venue is proper in this District because acts performed in furtherance of the transactions complained of in this action occurred in substantial part in this District.

## III. PARTIES

### A. Plaintiffs

13.     Plaintiff City of Miami General Employees' & Sanitation Employees' Retirement Trust owned shares of Bank of America common stock as of the October 10, 2008 record date and continued to hold these shares through the vote on December 5, 2008, as set forth in the

certification attached hereto as Exhibit A.

14.     Plaintiff Fort Worth Employees' Retirement Fund purchased shares of Bank of America common stock during the Class Period as set forth in the certification attached hereto as Exhibit B.

**B. Defendants**

15.     Defendant Bank of America, a Delaware corporation, is a financial holding company, providing a range of banking and non-banking financial services and products in the United States and internationally.

16.     Defendant Kenneth D. Lewis ("Lewis") is, and at all relevant times was, the Chairman of the Board of Directors and Chief Executive Officer of Bank of America.  Lewis solicited approval of the Acquisition through his recommendation as a member of the Company's board of directors (the "Board" or "BOD") appearing in the Proxy Statement for Shareholders to vote in favor of the Acquisition.  Lewis also personally signed a cover letter in the Proxy Statement soliciting Shareholder approval of the Acquisition.

17.     Defendant John A. Thain ("Thain") was, at the times relevant to this action, the Chief Executive Officer of Merrill Lynch and, in that capacity, he personally signed the Proxy Statement soliciting the votes of Bank of America shareholders in favor of the Acquisition.  The agreements entered into in connection with the Acquisition contemplated that Thain would assume a senior executive position managing Merrill Lynch's operations following the Acquisition.

## IV. CLASS ACTION ALLEGATIONS

18.     Plaintiffs bring this action as a class action under Rule 23 of the Federal Rule of

Civil Procedure on behalf of a class (the "Class") consisting of (i) all Bank of America

shareholders who held shares as of the record date of October 10, 2008 and were entitled to vote

with respect to the Acquisition at the December 5, 2008 special meeting of Bank of America

shareholders and were damaged thereby, and (ii) all persons who purchased or otherwise

acquired the securities of Bank of America in the period from January 2, 2009 through January

20, 2009 (the "Class Period") and were damaged thereby.  Excluded from the Class are the

defendants herein, members of the immediate families of the defendants, and any subsidiary,

affiliate, or controlled person of any such person or entity.  Also excluded from the Class are any

persons or entities who acquired their Bank of America shares during the Class Period by

exchanging their Merrill Lynch shares pursuant to the Acquisition.

19.     The Class is so numerous that joinder of all members is impracticable.  As of

October 10, 2008, there were 5,021,554,382 shares of Bank of America common stock

outstanding held by approximately 259,955 record holders and 7,667 shares of Bank of America

Series B Preferred Stock held by approximately 30 record holders.

20.     Plaintiffs' claims are typical of the claims of the other members of the Class,

because Plaintiffs and all members of the Class sustained damages arising out of Defendants'

conduct in violation of law as complained of herein.

21.     Plaintiffs will fairly and adequately protect the interests of the members of the

Class and have retained counsel competent and experienced in class action and investor

litigation.

22.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class individually to redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

23.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether defendants violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder by the SEC in issuing the Proxy Statements or in failing to update and correct the Proxy Statement;

(b)     whether defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false or misleading public statements or otherwise failing to disclose material adverse information concerning the results of Merrill Lynch's operations; and

(c)     the appropriate relief for the wrongs complained of in this Complaint.

## V. SUBSTANTIVE ALLEGATIONS UNDER SECTION 14a AND RULE 14a-9

### A. Bank of America Agrees to Acquire Merrill Lynch

24.     Bank of America, one of the world's largest financial institutions, is a bank holding company and a financial holding company under U.S. federal law.  Bank of America serves individual consumers, small and middle market businesses and large corporations with a full range of banking, investing, asset management and other financial and risk-management products and services.

25.     Prior to its acquisition of Merrill Lynch, Bank of America's operational strength and profitability came in principal from providing unmatched convenience in the United States, serving more than 59 million consumer and small business relationships with more than 6,000 retail banking offices, more than 18,000 ATMs and award-winning online banking with nearly 24 million active users.

26.     These advantages were magnified by increasing defaults on sub-prime mortgage loans and related mortgage-backed securities issued and/or held by other banks.  Bank of America claimed to have judiciously avoided significant exposure to such toxic assets, which, according to Bank of America, left it in an extremely strong competitive position within the financial services industry.  Bank of America came to be regarded as a "fortress bank" with an impregnable balance sheet guaranteed to weather the expected emerging storms of write downs and insolvencies.

27.     The turmoil affecting the financial markets created the opportunity for Bank of America to acquire Merrill Lynch.  On Saturday, September 13, 2008, defendant Thain contacted

defendant Lewis to initiate discussions concerning a possible acquisition of Merrill Lynch by Bank of America or other business combination between the entities. These discussions occurred over the next two days, culminating with the parties entering into an agreement, on September 15, 2008, for Bank of America to acquire Merrill Lynch.

28.    Thus, on September 15, 2008, Bank of America issued a press release (attached to a Form 8-K filed with the SEC that same day) announcing its proposed acquisition of Merrill Lynch. The press release stated in relevant part that:

> Bank of America Corporation today announced it has agreed to acquire Merrill Lynch & Co., Inc. in a $50 billion all-stock transaction that creates a company unrivalled [sic] in its breadth of financial services and global reach.
>
> "Acquiring one of the premier wealth management, capital markets, and advisory companies is a great opportunity for our shareholders," Bank of America Chairman and Chief Executive Officer Ken Lewis said. "Together, our companies are more valuable because of the synergies in our businesses."
>
> "Merrill Lynch is a great global franchise and I look forward to working with Ken Lewis and our senior management teams to create what will be the leading financial institution in the world with the combination of these two firms," said John Thain, chairman and CEO of Merrill Lynch.
>
> Under terms of the transaction, Bank of America would exchange .8595 shares of Bank of America common stock for each Merrill Lynch common share. The price is 1.8 times stated tangible book value.
>
> Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. The acquisition is expected to be accretive to earnings by 2010.
>
> The transaction is expected to close in the first quarter of 2009. It has been approved by directors of both companies and is subject to shareholder votes at both companies and standard regulatory approvals.

*  *  *

-11-

> Adding Merrill Lynch both enhances current strengths at Bank of America and creates new ones, particularly outside of the United States. Merrill Lynch adds strengths in global debt underwriting, global equities and global merger and acquisition advice.

> After the acquisition, Bank of America would be the number one underwriter of global high yield debt, the third largest underwriter of global equity and the ninth largest adviser on global mergers and acquisitions based on pro forma first half of 2008 results.

29.     In a conference call concerning the Acquisition later that day, Defendant Lewis sought to reassure the investing public that the Company had done sufficient due diligence to understand the risks and the quality of assets it would be acquiring in the Acquisition.  Lewis further endorsed the comments of Joe Price, Bank of America's Chief Financial Officer, that Bank of America was attuned to the quality of Merrill Lynch's credit because of its presence as a competitor in the marketplace and that although the due diligence period had been a short one, the diligence was conducted on a night-and-day basis and that, as a result, Bank of America was aware of the credit risks in the assets owned by Merrill Lynch:

> Just to touch on a few other things of importance in the transaction before taking questions, from a risk or due diligence perspective, as you heard Ken say, we competed against Merrill Lynch and have known them well for years in addition to discussing business opportunities several times. We sent in a large team to review areas such as asset valuations, trading positions, and the like.

30.     On September 18, 2008, Bank of America filed a Form 8-K with the SEC describing the terms of the Acquisition and attaching as Exhibit 2.1 an Agreement and Plan of Merger, dated as of September 15, 2008, by and between Merrill Lynch & Co., Inc. and Bank of America Corporation (the "Agreement").  The Agreement was signed by defendant Lewis on

behalf of Bank of America and by defendant Thain on behalf of Merrill Lynch.

**B. Defendants Issue, and Never Correct, the Misleading Proxy Statement**

31.     On October 31, 2008, Defendants disseminated the Proxy Statement in connection

with obtaining Shareholder approval of the Acquisition.  The Proxy Statement urged all Bank of

America shareholders to vote in favor of the Acquisition and recommended the Acquisition as

being fair and in the best interests of Bank of America shareholders.  As stated in the Proxy

Statement:

> The Bank of America board of directors believes that the merger is in the
> best interests of Bank of America and its stockholders and has
> unanimously approved the merger and the merger agreement. The Bank
> of America board of directors unanimously recommends that Bank of
> America stockholders vote "FOR" the proposal to issue shares of Bank
> of America common stock in the merger.

32.     The Proxy Statement also included detailed reported results with respect to Merrill

Lynch's operations for the fiscal quarter ended June 30, 2008 and under a heading titled "Recent

Developments" also discussed more recent financial results of Merrill Lynch.

33.     The Proxy Statement contained material misstatements and omissions because it

failed to disclose material facts to Bank of America shareholders necessary for them to cast fully

informed votes with respect to the Acquisition.  The Proxy Statement significantly overvalued

Merrill Lynch's assets and otherwise did not accurately disclose Merrill Lynch's financial

condition to Bank of America shareholders.   The Proxy Statement did not inform Bank of

America shareholders of the significant risks and liabilities that Bank of America and its

shareholders would be acquiring in the event the Acquisition closed.  Further, the Proxy

Statement did not reveal that Bank of America and its advisors had conducted inadequate

diligence on Merrill Lynch and that the recommendation in the Proxy Statement in favor of the

vote and the other positive statements concerning the vote were made without an adequate basis.

34.     On November 6, 2008, Merrill reported financial results for the fiscal quarter

ended September 30, 2008.  Those results included substantial mark downs in Merrill's assets

and resulted in Merrill reporting a net loss of over $5 billion.

35.     On November 26, 2008, the Federal Reserve Board approved the proposed

Acquisition.

36.     On December 5, 2008, Bank of America held a special meeting of shareholders to

vote on the Acquisition.  In advance of this vote, Defendants failed in their duty to update and

correct the material misstatements and omissions in the Proxy Statement.  Not only did

defendants never correct these material misstatements and omissions, but defendants did not

update investors concerning the continued deterioration of Merrill Lynch's financial condition

after the Proxy Statement was issued but before investors actually cast their votes on December

5, 2008.  During that period, Merrill Lynch had suffered additional losses in the investments and

securities it owned, amounting to billions of dollars in further losses and a significant increase in

the risk that Bank of America would take on if the Acquisition were consummated.  This

information, which was highly material to Bank of America shareholders and their decision

concerning the vote on the Acquisition, was never provided to shareholders prior to the

December 5, 2008 vote.

37.     Lacking the material facts necessary to fully appreciate the impact of the

Acquisition, at the December 5, 2008 special meeting, 82% of Bank of America shareholders who voted approved the Acquisition and the related issuance of additional shares by the Company necessary to consummate the Acquisition.  Bank of America promptly issued a press release announcing that its shareholders had approved the Acquisition.

**C. Some, But Not All, of the Truth is Revealed to Bank of America Shareholders**

38.    On January 14, 2009, after the stock market close, *The Wall Street Journal* reported that Bank of America was near an agreement with U.S. officials that would provide it with billions of dollars in financial assistance from the federal government, likely to include an infusion of fresh capital and the backstopping of billions of dollars of Bank of America's assets, according to the report. The news came after Bank of America's shares gyrated wildly during the day, as investors reacted to earlier reports that the firm would need more government funds to stay afloat.

39.    On January 15, 2009, multiple news services carried the story of an impending government bailout of Bank of America relating to its purchase of Merrill Lynch.  In reaction to these reports, Bank of America announced that it would move up its reporting of quarterly earnings.

40.    On January 16, 2009, Bank of America issued a press release reporting that for the fiscal quarter ended December 31, 2008, the Company had a net loss of $1.79 billion and diluted loss per common share of $0.48, with $15.31 billion in losses attributable to the reported results of Merrill Lynch for the quarter.  Merrill Lynch's losses were reportedly "driven by severe capital markets dislocations."  As a result of these reported losses, Bank of America disclosed that it

-15-

would be cutting its quarterly dividend to a nominal amount of one penny per share.  The press release also reported that:

> In view of the continuing severe conditions in the markets and economy, the U.S. government agreed to assist in the Merrill acquisition by making a further investment in Bank of America of $20 billion in preferred stock carrying an 8 percent dividend rate.
>
> In addition, the government has agreed to provide protection against further losses on $118 billion in selected capital markets exposure, primarily from the former Merrill Lynch portfolio. Under the agreement, Bank of America would cover the first $10 billion in losses and the government would cover 90 percent of any subsequent losses. Bank of America would pay a premium of 3.4 percent of those assets for this program.

41.    Significant negative fourth-quarter items for Merrill Lynch were reported in the January 16th press release, including:

- Credit valuation adjustments related to monoline financial guarantor exposures of $3.22 billion;

- Goodwill impairments of $2.31 billion;

- Leveraged loan write downs of $1.92 billion;

- $1.16 billion in the U.S. Bank Investment Securities Portfolio write downs; and

- Commercial real estate write downs of $1.13 billion.

42.    On January 16, 2009, *The Wall Street Journal* carried a story with a headline of "BofA's Latest Hit: Treasury to Inject $20 Billion More; Stock at 1991 Level."   The article stated, among other things that:

> The development angered some Bank of America shareholders who began to question why . . . Lewis didn't discover the problems prior to the Sept. 15 deal

-16-

announcement.  Many also wanted to know why he didn't disclose the losses prior

to the vote on the Merrill deal on Dec. 5 or before closing the deal on Jan. 1.

43.      The January 16th *Wall Street Journal* article also quoted Bradley Dorman,

managing partner of Whiterock Point Partners, L.P., an investment adviser with 315,000 shares

of Bank of America common stock as stating that: "Bank of America didn't do proper due

diligence."

44.      On January 17, 2009, *The Wall Street Journal* carried a story with a headline of

"Bank of America Goes on Offense: Stock Tanks on Quarterly Loss; Details of Bailout;

Employees Angry."  The story quoted Paul Miller, a securities analyst with the Friedman Billings

Ramsey Group Inc., as stating that Defendant Lewis "has very little credibility with the investor

public right now."

45.      Thereafter, on January 20, 2009, based on the new information revealed in the

previous days by Bank of America, analysts opined that Bank of America would need to raise an

additional $80 billion to restore its capital to adequate levels.

46.      Investors were shocked by these developments and quickly pushed down the price

of Bank of America common stock in active trading from its closing price of $10.20 per share on

January 14, 2009 to close at $5.10 per share on January 20, 2009, a decline of 50%.

## VI. CLAIMS UNDER SECTION 14(a) AND RULE 14a-9:  CLAIMS FOR RELIEF

47.      The claims set forth herein pursuant to Section 14 and Rule 14a-9 are not based on

any allegations of knowing or reckless misconduct by any defendant.  These claims do not allege,

and do not sound in, fraud, and Plaintiff specifically disclaims any reference to or reliance upon

allegations of fraud in these non-fraud claims under Section 14 and Rule 14a-9.

**First Claim for Relief for Violation of Section 14(a) of the Exchange Act and
Rule 14a-9 of the Securities and Exchange Commission**

(Against Bank of America, Lewis, and Thain)

48.     Plaintiff repeats and realleges each and every allegation contained above as if set
forth fully herein.

49.     This claim for relief is brought against defendants Bank of America, Lewis, and
Thain (collectively, the "Proxy Defendants").

50.     This claim for relief is brought by plaintiffs on behalf of the Class against the
Proxy Defendants for violations of Section 14(a) of the Exchange Act and Rule 14a-9
promulgated thereunder by the SEC, which prohibits making material misstatements and
omissions in a proxy statement.

51.     The misstatements and omissions alleged above were material.  The Proxy
Defendants made or were responsible for making the misstatements and omissions.  Through
their negligence in issuing the Proxy Statement containing material misstatements and omissions,
the Proxy Defendants failed to disclose to Bank of America shareholders all material facts
necessary for Bank of America shareholders to cast a fully informed vote with respect to the
Acquiisition, as alleged above.

52.     Plaintiff and other Shareholders have been injured by the material misstatements
and omissions contained in the Proxy Statement.

53.     Plaintiff and other members of the Class are entitled to recover damages to
compensate them for all damages resulting from the acts and omissions of the Proxy Defendants

in violation of Section 14(a) of the Exchange Act.

54.     Less than two years have elapsed from the time plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time this Complaint was filed.

## VII. SUBSTANTIVE ALLEGATIONS UNDER SECTION 10(b) AND RULE 10b-5

55.     The claims herein under Section 10b and Rule 10b-5 incorporate by reference the allegations set forth, *supra*, in paragraphs 1 through 46.

### A. Background of the Section 10(b) and Rule 10b-5 Claims

56.     Between the December 5, 2008 shareholder vote and the January 1, 2009 scheduled closing of the Acquisition, defendants were in possession of material non-public information concerning the deteriorating state of Merrill Lynch's financials and the significant negative impact that the Acquisition would have on Bank of America and its shareholders as a result.  Defendants did not disclose this information.  Rather, defendants allowed the Acquisition to be completed and, upon the closing of the Acquisition, issued false and misleading laudatory public statements concerning the "premier financial services franchise" created by the Acquisition.  As discussed below, these positive statements violated Section 10(b) and Rule 10b-5 by omitting to state material facts that were known to or recklessly disregarded by defendants and that were necessary to make the statements made not false and misleading.

57.     On or about December 8, 2008, Merrill Lynch held a board meeting in which its mounting losses and worsening financial condition were discussed.  According to *The Wall Street Journal*, attendees at the meeting were told about Merrill Lynch's continued losses,

principally arising from legacy positions and not from new trades.  In connection with these

growing losses, defendant Thain described November as "one of the worst months on Wall Street

in history."  Indeed, Merrill Lynch had been experiencing material client withdrawals during the

fourth quarter, amounting to approximately $10 billion in withdrawals by the end of the

quarter—which represented a more than threefold increase in withdrawals over the third quarter.

This material information was not disclosed to the investing public.

       58.     Shortly thereafter, defendant Lewis turned his attention to seeking federal

assistance to deal with the significant (though never disclosed to shareholders) losses at Merrill

Lynch.

       59.     On or about December 17, 2008, Defendant Lewis telephoned and later met in

person with Ben Bernanke, the Chairman of the Federal Reserve Board, and Henry Paulson, the

Secretary of the Treasury, to inform them that, given the amount of losses and write downs

Merrill Lynch was experiencing, Bank of America lacked the capital to close the Acquisition

without some form of government assistance.

       60.     Messrs. Bernanke and Paulson urged Defendant Lewis not to invoke the material

adverse change provision of the Agreement.  Instead, they offered to provide a cash infusion

through the purchase of additional shares of Bank of America preferred stock and a guarantee

against the losses which Bank of America would suffer from closing the Acquisition.  This

proposed purchase of additional shares by the federal government would necessarily have a

dilutive effect on existing shareholders and cause them harm thereby.  These discussions, as well

as the fact that Bank of America could not complete the Acquisition without the promise of

additional dilutive federal assistance as a result of Merrill Lynch's losses, was not disclosed to Bank of America shareholders.

## B. Defendants Issue False and Misleading Positive Statements Concerning the Acquisition

61.    On January 1, 2009, Bank of America completed the acquisition of Merrill Lynch. The closing of the Acquisition, coming only a little more than three months after first being announced, represented a particularly fast timetable for such a huge financial industry acquisition.

62.    In connection with the completion of the Acquisition, Bank of America issued a press release on January 1, 2009, entitled "Bank of America Completes Merrill Lynch Purchase."

> Bank of America Corporation today completed its purchase of Merrill Lynch & Co., Inc. creating a premier financial services franchise with significantly enhanced wealth management, investment banking and international capabilities.
>
> "We created this new organization because we believe that wealth management and corporate and investment banking represent significant growth opportunities, especially when combined with our leading capabilities in consumer and commercial banking," said Bank of America Chairman and Chief Executive Officer Ken Lewis. "We are now uniquely positioned to win market share and expand our leadership position in markets around the world."
>
> Bank of America will have the largest wealth management business in the world with approximately 20,000 financial advisors and more than $2 trillion in client assets. Global investment management capabilities will include approximately 50 percent ownership in BlackRock Inc., which at September 30 had $1.26 trillion in assets under management. Bank of America had $564 billion in assets under management in the same period.
>
> The combination also adds strengths in debt and equity underwriting, sales and trading, and merger and acquisition advice, creating significant opportunities to deepen relationships with corporate and institutional clients around the globe.

-21-

Under terms of the agreement, shareholders of Merrill Lynch received .8595 shares of Bank of America common stock for each common share of Merrill Lynch.

As previously announced, Bank of America expects to achieve $7 billion in pre-tax expense savings, fully realized by 2012. Cost reductions will come from a range of sources, including the elimination of positions announced on December 11, and the reduction of overlapping technology, vendor and marketing expenses. In addition, the company is expected to benefit by leveraging its broad product set to deepen relationships with existing Merrill Lynch customers.

63.     The statements set forth in the January 1, 2009 press release were materially false and misleading because they did not reveal the true facts concerning Merrill Lynch's deteriorating financial condition, did not reveal that Bank of America had considered withdrawing from the Acquisition as a result of the financial condition of Merrill Lynch, and did not disclose that Bank of America was only willing to complete the transaction because the federal government had undertaken to assist Bank of America to absorb the acquisition of Merrill Lynch by, among other things, engaging in a highly dilutive purchase of additional shares of Bank of America.  This material information was known to or recklessly disregarded by defendants and the failure to disclose this information constituted a violation of Section 10(b) and Rule 10b-5.

**C. Loss Causation**

64.     As set forth in paragraphs 38 through 46 , *supra*, corrective disclosures taking place between January 14, 2009 and January 20, 2009 revealed previously undisclosed material information concerning, *inter alia*, Merrill Lynch's deteriorated financial state, Bank of

America's reticence to close the transaction in light of Merrill Lynch's difficulties, and Bank of America's need for federal financial assistance in order to survive the Acquisition and successfully absorb Merrill Lynch.  These corrective disclosures shocked investors and quickly pushed down the price of Bank of America common stock in active trading from its closing price of $10.20 per share on January 14, 2009 to close at $5.10 per share on January 20, 2009, a decline of 50%.

## VII. CLAIMS UNDER SECTION 10(b) AND RULE 10b-5:  CLAIMS FOR RELIEF

65.    The claims set forth herein pursuant to Section 10(b) and Rule 10b-5 sound in fraud and are based on knowing or reckless misconduct by defendants.  These claims are independent of any other claims asserted herein and the allegations of fraud pertaining to the claims under Section 10(b) and Rule 10b-5 do not apply in any way to the other claims for relief asserted herein.

### Second Claim for Relief for Violation of Section 10(b) of the Exchange Act and Rule 10b-5 of the Securities and Exchange Commission

(Against Bank of America and Lewis)

66.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

67.    This claim for relief is brought against defendants Bank of America and Lewis (collectively, the "Fraud Defendants")

68.    This Claim is brought pursuant to Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder, on behalf of Plaintiff and all other members of the Class, against the Fraud Defendants.

69.     Throughout the Class Period, the Fraud Defendants individually, and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce, the mails and the facilities of a national securities exchange, employed devices, schemes and artifices to defraud, made untrue statements of material fact and/or omitted to state material facts necessary to make statements made not misleading, and engaged in acts, practices and a course of business which operated a fraud and deceit upon Class members, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

70.     The Fraud Defendants' false and misleading statements and omissions were made with scienter and were intended to and did, as alleged herein, (i) deceive the investing public, including Plaintiffs and the other members of the Class; (ii) artificially create, inflate and maintain the market for and market price of the Company's securities; and (iii) cause members of the Class to purchase Bank of America securities at inflated prices.

71.     The Fraud Defendants were individually and collectively responsible for making the statements and omissions alleged herein, by virtue of having prepared, approved, signed and/or disseminated documents and/or other public statements containing untrue statements of material fact and/or omitting facts necessary to make the statements therein not misleading and/or making direct statements to the investing public on the conference calls detailed herein.

72.     As described herein, the Fraud Defendants made the false statements and omissions knowingly, or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and other members of the Class who purchased Bank of America securities during the Class Period.  Throughout the Class Period, Defendants had a duty to disclose new,

-24-

material information that came to their attention, which rendered their prior statements to the market materially false and misleading.

73.     Defendants' false statements and omissions were made in connection with the purchase or sale of the Company's securities by members of the Class.

74.     In ignorance of the false and misleading nature of Defendants' statements and/or in reliance upon the integrity of the market price for Bank of America securities, Plaintiffs and the other members of the Class purchased the Company's securities at artificially inflated prices during the Class Period.  But for the fraud, they would not have purchased the Company's securities at artificially inflated prices.

75.     The market price for Bank of America securities declined materially upon the public disclosure of the facts that had previously been misrepresented or omitted by the Defendants, as described above.

76.     Plaintiffs and the other members of the Class were substantially damaged as a direct and proximate result of their purchases of Bank of America securities at artificially inflated prices and the subsequent decline in the price of those securities when the true state of affairs was revealed.

77.     This claim was brought within two years after discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

78.     By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and are liable to Plaintiffs and the members of the Class, each of whom has been damaged as a result of such violation.

**Third Claim for Relief for Violation of Section 20(a) of the Exchange Act**

(Against Lewis)

79.    Plaintiffs repeat and reallege each and every allegation contained above as if set forth fully herein.

80.    This claim for relief is brought against defendants Lewis.

81.    As alleged herein, Bank of America is liable to the members of the Class who purchased its securities based on the materially false and misleading statements and omissions set forth above, pursuant to Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

82.    Throughout the Class Period, Lewis was a controlling person of Bank of America within the meaning of Section 20(a) of the Exchange Act, and a culpable participant in Bank of America's fraud and violation of the federal securities laws, as detailed herein.

83.    Lewis exercised control over Bank of America during the Class Period by virtue of, among other things, his position with the Company, the key roles he played within the Company, and his involvement in its public disclosures.

84.    This claim was brought within two years after the discovery of this fraud and within five years of the making of the statements alleged herein to be materially false and misleading.

85.    By virtue of the forgoing, Lewis is liable to the members of the Class, each of whom has been damaged as a result of Bank of America's underlying violations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court grant the following relief:

(A)    Declaring this action to be a proper class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of the Class defined herein;

B.    Awarding Plaintiffs and the members of the Class compensatory damages;

C.    Awarding Plaintiffs and the members of the Class pre-judgment and post-

judgment interest, as well as reasonable attorneys' fees, expert witness fees and other costs; and

D.    Awarding such other relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all claims on which a jury trial is available.

Dated: January 28, 2009

BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP

Gerald H. Silk
Salvatore J. Graziano
Noam Mandel
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444

*Attorneys for Plaintiffs City of Miami General
Employees' and Sanitation Employees' Retirement
Trust and Fort Worth Employees' Retirement Fund*

KLAUSNER & KAUFMANN, P.A.
Robert D. Klausner
10059 N.W. 1st Court
Plantation, FL 33324

-27-

Telephone: (954) 916-1202
Facsimile:  (954) 916-1232

*Additional Counsel for Plaintiffs City of Miami
General Employees' and Sanitation Employees'
Retirement Trust and Fort Worth Employees'
Retirement Fund*

**ABRAHAM, FRUCHTER & TWERSKY, LLP**
JEFFREY S. ABRAHAM
One Penn Plaza, Suite 2805
New York, New York  10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655

*Of Counsel*

-28-